# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MYCAH DAWN WHITMAN**, | Case No. 3:16-cv-919-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **NANCY A. BERRYHILL**, Commissioner of Social Security, | |
| Defendant. | |

Lisa R.J. Porter, JP Law PC, 5200 SW Meadows Road, Suite 150, Lake Oswego, OR 97035. Attorney for Plaintiff.

Billy J. Williams, Interim United States Attorney, and Janice E. Hébert, Assistant United States Attorney, United States Attorney's Office, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204-2902; Ryan Lu, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, 701 Fifth Avenue, Suite 2900 M/S 221A, Seattle, WA 98104-2240. Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Mycah D. Whitman seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). Because the Commissioner's decision is not based on the proper legal standards and the findings are not supported by substantial evidence, the decision is REVERSED and REMANDED for further proceedings.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence. 42 U.S.C. § 405(g); *see also Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). "Substantial evidence" means "more than a mere scintilla but less than a preponderance." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews*, 53 F.3d at 1039).

Where the evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading of the record, and this Court may not substitute its judgment for that of the Commissioner. *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193, 1196 (9th Cir. 2004). "[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (quotation marks omitted)). A reviewing court, however, may not affirm the Commissioner on a ground upon which the Commissioner did not rely. *Id.*; *see also Bray*, 554 F.3d at 1226.

## BACKGROUND

### A. Plaintiff's Application

Ms. Whitman filed applications for DIB and SSI on October 10, 2012, alleging disability as of January 1, 2008. AR 19, 110-11. Born in April 1987, Ms. Whitman was 20 years old on the alleged disability onset date and 26 at the time of the hearing. AR 19, 112. She speaks English

and graduated from high school. AR 23, 66. She alleges disability due to obsessive-compulsive disorder ("OCD"), depression, and anxiety. AR 86. The Commissioner denied her application initially and upon reconsideration, and she requested a hearing before an Administrative Law Judge ("ALJ"). AR 104-05, 110-11. After an administrative hearing held on September 14, 2014, the ALJ found Ms. Whitman not disabled in a decision dated November 24, 2014. AR 19-43. The Appeals Council denied Ms. Whitman's subsequent request for review on April 4, 2016. AR 1-3. The ALJ's decision thus became the final decision of the Commissioner, and Ms. Whitman sought review in this Court.

## B. The Sequential Analysis

A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011); *see also* 20 C.F.R. §§ 404.1520 (DIB), 416.920 (SSI); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). Each step is potentially dispositive. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The five-step sequential process asks the following series of questions:

1. Is the claimant performing "substantial gainful activity?" 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). This activity is work involving significant mental or physical duties done or intended to be done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910. If the claimant is performing such work, she is not disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not performing substantial gainful activity, the analysis proceeds to step two.

2. Is the claimant's impairment "severe" under the Commissioner's regulations? 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An

impairment or combination of impairments is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Unless expected to result in death, this impairment must have lasted or be expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 416.909. If the claimant does not have a severe impairment, the analysis ends. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant has a severe impairment, the analysis proceeds to step three.

3. Does the claimant's severe impairment "meet or equal" one or more of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the impairment does not meet or equal one or more of the listed impairments, the analysis continues. At that point, the ALJ must evaluate medical and other relevant evidence to assess and determine the claimant's "residual functional capacity" ("RFC"). This is an assessment of work-related activities that the claimant may still perform on a regular and continuing basis, despite any limitations imposed by his or her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545(b)-(c), 416.920(e), 416.945(b)-(c). After the ALJ determines the claimant's RFC, the analysis proceeds to step four.

4. Can the claimant perform his or her "past relevant work" with this RFC assessment? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant cannot perform his or her past relevant work, the analysis proceeds to step five.

5. Considering the claimant's RFC and age, education, and work experience, is the claimant able to make an adjustment to other work that exists in significant numbers in the national economy? If so, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1560(c), 416.960(c). If the claimant cannot perform such work, he or she is disabled. *Id.*

*See also Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

The claimant bears the burden of proof at steps one through four. *Id.* at 953; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *Yuckert*, 482 U.S. at 140-41. The Commissioner bears the burden of proof at step five. *Tackett*, 180 F.3d at 1100. At step five, the Commissioner must show that the claimant can perform other work that exists in significant

numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.*; *see also* 20 C.F.R. §§ 404.1566, 416.966 (describing "work which exists in the national economy"). If the Commissioner fails to meet this burden, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If, however, the Commissioner proves that the claimant is able to perform other work existing in significant numbers in the national economy, the claimant is not disabled. *Bustamante*, 262 F.3d at 953-54; *Tackett*, 180 F.3d at 1099.

## C. The ALJ's Decision

The ALJ performed the sequential analysis. AR 21-43. At step one, the ALJ found Ms. Whitman had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date. AR 21. At step two, the ALJ concluded that Ms. Whitman had the following severe impairments: asthma, depression, anxiety, OCD, and obesity. AR 21. At step three, the ALJ determined that Ms. Whitman did not have an impairment or combination of impairments that met or equaled a listed impairment. AR 22.

The ALJ next assessed Ms. Whitman's RFC and found that she could perform medium work except that she must avoid all exposure to hazards and must avoid concentrated exposure to fumes, odors, dusts, and gases; and she is limited to unskilled work with only incidental contact with the public and co-workers. AR 25. At step four, the ALJ found that Ms. Whitman could not perform her past relevant work. AR 41. At step five, based on the testimony of a vocational expert ("VE"), the ALJ concluded that Ms. Whitman could perform jobs that exist in significant numbers in the national economy, including linen supply room worker and laundry worker. AR 42. Accordingly, the ALJ found Ms. Whitman not disabled. *Id.*

**DISCUSSION**

Ms. Whitman contends the ALJ made the following errors in evaluating her case: (1) improperly assessing her symptom testimony; (2) improperly assessing the medical opinion evidence; (3) failing properly to credit lay testimony; (4) finding she did not meet a listing at step two; and (5) formulating an inaccurate RFC, which led to further error at step five.

**A. Plaintiff's Symptom Testimony**

There is a two-step process for evaluating the credibility of a claimant's testimony about the severity and limiting effect of the claimant's symptoms. *Vazquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ "must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1029, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). When doing so, the claimant "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).

Second, "if the claimant meets this first test, and there is no evidence of malingering, 'the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so.'" *Lingenfelter*, 503 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281). It is "not sufficient for the ALJ to make only general findings; he must state which pain testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Those reasons must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Ortez v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell*, 947 F.2d at 345-46).

Effective March 16, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all of the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The Commissioner recommends that the ALJ examine "the entire case record, including the objective medical evidence and individual's statements about the intensity, persistence, and limiting effects of symptoms statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. The Commissioner recommends assessing: (1) the claimant's statements made to the Commissioner, medical providers, and others regarding the claimant's location, frequency and duration of symptoms, the impact of the symptoms on daily living activities, and other methods used to alleviate symptoms; (2) medical source opinions, statements, and medical reports regarding the claimant's history, treatment, responses to treatment, prior work record, efforts to work, daily activities, and other information concerning the intensity, persistence, and limiting effects of an individual's symptoms; and (3) non-medical source statements, considering how consistent those statements are with the claimant's statements about his or her symptoms and other evidence in the file. *See id.* at *6-7.

The ALJ's credibility decision may be upheld overall even if not all of the ALJ's reasons for rejecting the claimant's testimony are upheld. *See Batson*, 359 F.3d at 1197. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom

testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

At the hearing, Ms. Whitman endorsed significant limitations arising from anxiety and OCD. She described experiencing extreme anxiety, including fears related to driving, leaving the house, workplace interactions with co-workers and the public, testifying at the hearing, and even entering certain rooms in her own home. AR 63, 65-68, 74-75. Ms. Whitman testified that she needed assistance raising her three-year-old son, as she is unable to do the laundry, prepare proper meals, or clean the dishes because of thoughts of imminent catastrophe. AR 70-71. She felt she would not be able to work due to frequent disruptions of "bad thoughts" and panic attacks. AR 72-73. For example, she told the ALJ she would not be able to assemble pens because they would have been touched by so many other people that the thought of germs would be a disruptive concern for her; additionally, she would be panicked about the thought of her work being reviewed by a supervisor. AR 76. Ms. Whitman related an incident where she flew by herself to California to meet her current boyfriend, which she found extremely stressful, but was able to endure by taking medication (Lorazepam) and performing breathing exercises. She testified that although Lorazepam is helpful for relaxing her, it makes her drowsy and "loopy," and she would not be able to use it while working. AR 74-75.

The ALJ found Ms. Whitman's symptom allegations were not credible because they were "almost completely inconsistent with the evidence of record." AR 35. In support, the ALJ noted that Ms. Whitman had worked as a cashier for two months in 2011. The ALJ further explained that her ability to fly to California on her own in 2012 belies her symptom testimony, as inconsistencies involving her therapist's chart notes did not reflect the level of trauma that Ms. Whitman described at the hearing when recounting the trip. AR 35.

Ms. Whitman argues the ALJ's findings regarding her ability to work in 2011 and travel in 2012 are examples of inappropriately selecting isolated examples of psychological improvement over a period of years, even though the record as a whole reflects longstanding and severe psychological symptoms. *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014); *see also Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). For the reasons that follow, the Court agrees.

First, the ALJ's finding regarding the 2011 cashier job is not clear-and-convincing. Ms. Whitman explained that she had great difficulty with the job; further, she was employed by a family member who was sensitive to her psychological needs, and moreover, she benefited by working *with* her then-husband. AR 29-30; *see Garrison*, 759 F.3d at 1017 (improved functioning in the context of limited environmental stressors does not necessarily mean a claimant can perform adequately in a typical workplace).

The ALJ also appears to have impugned Ms. Whitman's credibility in general for indicating in her disability report that she stopped working the cashier job because "she became pregnant," concluding that because Ms. Whitman gave birth three days after her job ended on May 15, 2011, that she did not quit "because she became pregnant." AR 30 n.2. The ALJ's statement, however, is inaccurate. Ms. Whitman indicated she stopped working because "I was pregnant." AR 235. In fact, Ms. Whitman was hours away from giving birth, which is not only a true statement about why she left the job, but a valid reason. Given that the job uniquely provided family support, that it lasted only two months, and that Ms. Whitman was forthcoming about her reason for leaving, the ALJ's findings are not clear and convincing.

Next, the ALJ impugned Ms. Whitman's symptom allegations because in November 2012, Ms. Whitman flew to California to meet her future boyfriend. AR 35. The ALJ found that

her ability to go on the trip evinced a higher functional ability than she alleged. Ms. Whitman, however, described being extremely anxious in the weeks leading up to the trip and during and after the flight. AR 68-69. In order to avoid a panic attack, Ms. Whitman took two Lorazepam pills and practiced breathing exercises. *Id.* She further described vomiting after landing due to stress, and expressing dread at the thought of having to take a return flight. *Id.* The ALJ found that contemporaneous therapy notes contradicted Ms. Whitman's testimony that the trip was an ordeal. AR 35. The ALJ's finding, however, is unsupported because the record reflects that she was "afraid" to take the trip and that she was proud of herself for going despite her anxiety. AR 409, 411.

The Commissioner argues that the ability to take a flight is sufficient to impugn symptom testimony, citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 n.3 (9th Cir. 2008). The instant case is distinguishable from *Tommasetti*. Ms. Whitman took a relatively short flight from Oregon to California. AR 23. She indicated she was panicked throughout the flight and required medication in order to keep her composure. AR 68-69. In contrast, the claimant in *Tommassetti* flew from the United States to Venezuela. *Tommassetti*, 533 F.3d at 1040 n.3. He then proceeded to stay in Venezuela *for an extended time* to care for a sick family member. *Id.* Further, the ALJ in *Tommassetti* found the claimant's ability take a long flight and then provide extended care to his sister inconsistent with his allegations that back pain prevented him from sitting for more than ten minutes due to disabling back pain. *See id.* at 1037, 1040. Thus, aside from the fact that air travel was involved, the cases share little in common.

Further, although Ms. Whitman showed improvement shortly before and after the trip, the therapy notes indicate her progress was once again in decline by December. AR 400, 402, 404, 408. Accordingly, her plane trip is not clear and convincing evidence that her symptom

allegations are not credible. Further, the ability to take a single short flight, with the benefit of medication and while still experiencing strong symptoms, is insufficient to establish a threshold for transferable work skills. *Orn*, 495 F.3d at 639.

The ALJ further noted that Ms. Whitman's symptom allegations as to her ability to care for her child were inconsistent. For example, Ms. Whitman testified that she is unable to care for her son properly without assistance. AR 70-71. Ms. Whitman also explained that she feared entering her kitchen, and the thought of doing the dishes "terrifies" her, apparently because she is worried that food is contaminated with germs, and also that she has "terrible memories that have caused her to be resistant to certain tasks, like doing laundry, eating at other people's homes, and keeping her body clean." AR 70, 321, 405.

In May 2012, however, Ms. Whitman told one-time examining psychologist Molly C. McKenna, Ph.D., that on a typical day, she takes care of her son. AR 320. In October 2012, she reported improvement with her symptoms, reported playing with her son more often, and she felt as if she was a good mother. AR 413, 417. In January 2014, Ms. Whitman told her therapist that she was taking care of her son on her own during the day, and was feeling more confident as a mother, and was proud of her progress. AR 646-47. In March 2014, Ms. Whitman reported progress in some areas of her life, including her ability to make meals for her son. AR 637. By June 2014, Ms. Whitman reported being motivated to take full custody of her son following her divorce, and indicated she was "able to successfully care for her son, despite her obsessive-compulsive issues." AR 624. She also indicated that she still had "difficulty being in her kitchen at times." *Id.*

In addition, Ms. Whitman provided equivocal testimony about her ability to enter her laundry room. 417, 427. Dr. McKenna noted in May 2012 that Ms. Whitman "did her own

laundry." A few months later, Ms. Whitman told her therapist that she was able to enter the

laundry room, despite some trepidation, and load and unload the washer and dryer. AR 423. By

2014, Ms. Whitman stated she was feeling more comfortable in her kitchen, but was still having

"trouble" going into her laundry room. AR 770. The ALJ impugned Ms. Whitman's credibility

for her apparently equivocal statements about her anxiety surrounding her laundry room, and

further invoked the laundry room issue as a basis for finding that Ms. Whitman was malingering.

      Although the ALJ's findings regarding Ms. Whitman's ability to care for her son, enter

her laundry room, and prepare meals up to four times per week for her son are supported by the

record, those activities are nonetheless extremely limited. Indeed, despite her improved ability to

use her kitchen and laundry room, there is no dispute that Ms. Whitman continues to be

hampered by "innumerable" OCD rituals. AR 320. In July 2013, Ms. Whitman reported her

repetitive behaviors and OCD symptoms were worsening. AR 666. By July 2014,

Ms. Whitman's therapist noted that it was unlikely Ms. Whitman could complete a full workday

successfully without being interrupted by OCD symptoms because she lacked coping skills to

deal with normal stressors. AR 751. The therapist described her "extreme, debilitating symptoms

of [OCD]," which "prevent her from engaging with others." AR 629. In July 2014, Ms. Whitman

reported "increased frustration with others and trouble engaging in self-care and activities

outside her home." AR 743. These reports are consistent with the earlier assessment by

Dr. McKenna, which noted "almost complete withdrawal and severe anxiety," as well as

"variable mood, extreme sensitivity to circumstantial stress . . . compulsive behaviors, obsessive

concerns about contamination . . . and social isolation. AR 324, 329. Accordingly, the ALJ's

findings that "her OCD symptoms had been reduced" and "she had success in preparing food and

being around germs" were perhaps accurate for a several weeks in January 2014, but the record

as a whole reflects serious anxiety, depression, and OCD that persisted throughout the relevant time period, despite intervals of improvement. AR 36.

In *Garrison*, the Ninth Circuit admonished:

> Reports of "improvement" in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms . . . [and also] with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in the workplace.

*Garrison*, 759 F.3d at 1017. Although Ms. Whitman exhibited some improvement in her symptoms, the record consistently reflects that she continued to have some severe symptoms that would be unlikely to allow her to function in a competitive workplace.

The ALJ further impugned Ms. Whitman's symptom allegations by finding that her symptoms were controlled by medications. For example, the ALJ noted that when Ms. Whitman began to take Luvox, she "quickly improved." AR 36. In context, Ms. Whitman began taking Luvox following a suicide attempt in 2009, and even though her suicidal ideation decreased, she continued to report "increased anxiety and increased irritable moods," and she also reported insomnia. AR 301. The ALJ also noted that in March 2013, Ms. Whitman reported that "her medications were managing her anxiety and depression very well." AR 34. At her session later the same month, however, Ms. Whitman described that she was regressing, and expressed difficulties with self-care, including feeding herself. AR 637. In May 2014, she continued to report that she was not progressing adequately. AR 633, 631. As noted above, Ms. Whitman's therapist assessed severe limitations in July 2014 despite her medications. AR 746-52. Accordingly, although the record includes discrete periods of improvement with medication, medication has not alleviated Ms. Whitman's symptoms completely, and the ALJ glossed over instances where symptoms returned despite her medications. *Ghanim*, 763 F.3d at 1164 (ALJ

may not cherry-pick instances of improved psychological symptoms when the record as a whole reflects longstanding psychological disability).

The Commissioner, citing *Tommasetti*, 533 F.3d at 1040, argues that Ms. Whitman merely offers an alternative interpretation of the evidence, and that because the ALJ's interpretation was rational, the court is bound to uphold it. Although the ALJ pointed out some contradictions in Ms. Whitman's testimony by highlighting isolated periods of improvement, the contradictions the ALJ cited do not reasonably negate all of Ms. Whitman's symptom testimony. Even assuming that Ms. Whitman has made strides in her ability to independently care for her son, perform household chores, and has experienced improvement at times with medication, the record as a whole nevertheless reflects severe impairment, *generally* consistent with Ms. Whitman's allegations of persistent and disruptive mental impairment. *Garrison*, 759 F.3d at 1018 ("While ALJs obviously must rely on examples to show why they do not believe that a Ms. Whitman is credible, the data points they choose *must in fact* constitute examples of a broader development to satisfy the applicable 'clear and convincing' standard.").

As was the case in *Garrison*, the record as a whole reflects a tortuous path of waxing and waning symptoms, but with persistent and severe impairment, rather than a clear pattern of improvement. Ms. Whitman continues to experience longstanding severe anxiety, disruptive OCD coping mechanisms, depression, isolation, and substantial difficulty dealing with day-to-day stresses. For these reasons, the ALJ's credibility finding cannot be upheld.

## B.  Medical Opinion Evidence

Ms. Whitman argues the ALJ improperly rejected opinions provided by treating medical sources. The ALJ is responsible for resolving conflicts in the medical record, including conflicting physicians' opinions. *Carmickle*, 533 F.3d at 1164. The Ninth Circuit distinguishes between the opinions of three types of physicians: treating physicians, examining physicians, and

non-examining physicians. The opinions of treating physicians are generally accorded greater weight than the opinions of non-treating physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). A treating doctor's opinion that is not contradicted by the opinion of another physician can be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991).

If a treating doctor's opinion is contradicted by the opinion of another physician, the ALJ must provide "specific, legitimate reasons" for discrediting the treating doctor's opinion. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983). Additionally, the ALJ must accord greater weight to the opinion of an examining physician than that of a non-examining physician. *Lester*, 81 F.3d at 830. As is the case with a treating physician's opinion, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). If the opinion of an examining physician is contradicted by another physician's opinion, the ALJ must provide "specific, legitimate reasons" for discrediting the examining physician's opinion. *Lester*, 81 F.3d at 830. Specific, legitimate reasons for rejecting a physician's opinion may include its reliance on a claimant's discredited subjective complaints, inconsistency with the medical records, inconsistency with a claimant's testimony, or inconsistency with a claimant's ADLs. *Tommasetti*, 533 F.3d at 1040. It is error to ignore an examining physician's medical opinion without providing reasons for doing so; an ALJ effectively rejects an opinion when he ignores it. *Smolen*, 80 F.3d at 1286.

As noted above, Dr. McKenna performed a one-time evaluation of Ms. Whitman in May 2012. After reviewing the medical record through January 2012, Dr. McKenna produced a narrative history, clinical formulation/prognosis, and also completed a check-box functional report. AR 317-29. Dr. McKenna indicated Ms. Whitman was markedly limited in numerous

areas, including carrying out detailed instructions, maintaining attention and concentration for long periods, working on a regular schedule, completing a normal workday or workweek without symptom-related interruptions, interacting appropriately with the general public, and getting along with co-workers without distraction. AR 327. The doctor further indicated that Ms. Whitman had moderate to marked limitation in ADLs, marked limitation in social functioning, and moderate to marked limitation in concentration, persistence, and pace. AR 328. Overall, Dr. McKenna opined that Ms. Whitman would not be able to work in her current condition, but could attempt part-time work or vocational rehabilitation in conjunction with therapy and medication. AR 324-25.

The ALJ noted that Dr. McKenna's functional assessments were incongruent with Ms. Whitman's "mild symptoms" during her evaluation. AR 40. Presumably, the ALJ was referencing Dr. McKenna's observations that Ms. Whitman's behavior was "appropriate and conservative," her "eye contact was good," she was a "good historian," and her "attention and concentration appear to be intact." AR 321. In finding "mild symptoms," however, the ALJ disregarded Dr. McKenna's observations that Ms. Whitman was "psychomotor agitated," had an "agitated and nervous" affect, and was "periodically tearful"; all behaviors consistent with Dr. McKenna's assessment. AR 321-22. Indeed, Dr. McKenna concluded that "the most notable aspect of her presentation is severe anxiety." AR 323. To the extent that the most notable aspect of Ms. Whitman's presentation was "severe anxiety," the ALJ's finding that Ms. Whitman presented with only mild symptoms is directly contradicted, and therefore not supported by substantial evidence; nor does it meet the "specific and legitimate reasons" threshold.

The Commissioner argues that the ALJ properly discounted Dr. McKenna's opinion because Ms. Whitman's statements to the doctor were contradicted by later records. Specifically,

the Commissioner contends that Ms. Whitman reported to Dr. McKenna that she could not cook meals, but later reported to a therapist, Sheila Flanagan, LPC, that she "had cooked a meal" and "was spending more time in the kitchen." AR 36. The Commissioner, however, ignores the fact that at the time of her evaluation with Dr. McKenna, the record consistently reflects Ms. Whitman was very rarely entering her own kitchen due to anxiety, which was the topic of numerous therapy sessions. Eventually, Ms. Whitman gained confidence and began using the kitchen more often, but not until *after* Dr. McKenna's evaluation. As such, the Commissioner's conclusion is unsound.

Ms. Whitman's therapist, Adrienne Bush, M.A., QMHP, treated her for two years and completed an attorney-generated "Mental Impairment Questionnaire" in July 2014. Ms. Bush indicated Ms. Whitman would have difficulty maintaining her stamina at work, would require a reduced work pace, would not get along with co-workers or the public, would be absent more than four times per month on average, would be unlikely to complete a workday without interruptions due to symptoms, and was "markedly" or "extremely" limited in several functional areas. See AR 745-52. Her report was co-signed by Laura Taylor, Psy.D., and as such, the Commissioner concedes that the opinion should be considered as that of an acceptable medical source. *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996).

The ALJ found that the opinions provided by Ms. Bush and Dr. Taylor warranted "only moderate weight." AR 40. The ALJ explained that Ms. Whitman's "therapists have been taken in by the claimant's histrionic presentation and, in her therapist's case, her manipulation of the treatment process to suit her own ends." AR 40. In support, the ALJ discussed that Ms. Whitman provided statements to Ms. Bush that "served several useful purposes which furthered her interests," including:

1. That she needed help in increasing her functionality;
2. That her therapy was beneficial in increasing her functionality;
3. Provided gratification for her therapists in reassuring them that their efforts were successful and was thus likely to increase their affinity with the claimant;
4. And most important, provided validation for the claimant that she was competent and able to perform these and other tasks; validation that was reflexively withheld from her by her mother.

AR 40.

In short, the ALJ determined that Ms. Whitman was feigning the severity of her psychological symptoms for secondary gain; in other words, malingering. The ALJ explained that because Ms. Bush provided "validation," Ms. Whitman had "very good reasons for exaggerating the extent of her limitations," while she did not have a good reason to exaggerate her abilities to Dr. McKenna, whom she only saw once. AR 40. The ALJ therefore surmised that "inconsistencies" between Ms. Whitman's statements to Dr. McKenna and Ms. Bush were motivated by secondary gain. As discussed below, however, the ALJ's theory runs afoul of Ninth Circuit case law. Moreover, rationales the ALJ cites in support do not meet the requisite legal threshold to reject the treating and examining medical sources in favor of the state agency psychologist.

First, although the ALJ did not explicitly make a finding of malingering, there is little question the finding is implicit in the decision. Typically, in order to make such a finding, "affirmative evidence" of malingering must be identified by a medical or non-medical source. *Smolen*, 80 F.3d at 1284; *see Swenson v. Sullivan*, 876 F.2d 683, 688 (9th Cir. 1989) ("The ALJ found Swenson credible, and no doctor suggested that Swenson was malingering); *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984) ("No witness, qualified expert or otherwise, expressed the opinion that claimant was in any way malingering.") (citation omitted); *see also Leitheiser v. Astrue*, No. 6:10-cv-06243-SI, *available at* 2012 WL 967647, at *10 (Mar. 16,

2012) (ALJ erred to interpret a Waddell Test for fibromyalgia as evidence of malingering because the examining physician did not affirmatively find the result constituted malingering). Neither Dr. McKenna, Ms. Bush, nor Dr. Taylor stated or implied that Ms. Whitman was malingering. AR 317-25, 745-52.

Although an ALJ may weigh and resolve ambiguities in the medical record, the ALJ is not a medical expert, and may not go outside the record to make medical assessments as to a claimant's condition. *Donathan v. Astrue*, 264 Fed.Appx. 556, 561 (9th Cir. 2008) (Graeber, J., dissenting) (quoting *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). Further, on this record, there are no objective test results suggesting malingering. Moreover, no physicians of record suspected malingering, including the state reviewing physician whom the ALJ accorded "substantial weight." AR 40. Indeed, Ms. Bush and Dr. Taylor affirmatively indicated Ms. Whitman *was not* a malingerer. AR 747. Accordingly, by positing his own theory as to Ms. Whitman's alleged histrionic presentation and manipulation of qualified mental health experts, the ALJ inappropriately substituted the medical expert opinion for his own.

Second, Ms. Whitman's reports to Dr. McKenna and Ms. Bush were generally consistent. Indeed, the reports the physicians completed both found that Ms. Whitman has negative thought patterns, high anxiety, and OCD behaviors arising from her upbringing. AR 748. Both noted that she has marked limitations in social functioning. Both indicated she would have marked difficulty carrying out detailed instructions, maintaining concentration for extended periods, adequately performing activities within a normal work schedule, and working in proximity to others without becoming unduly distracted. AR 327-28, 750-1. Both reports noted at least moderate impairments in concentration, persistence, and pace and restrictions in ADLs. AR 328, 751. The providers also noted that Ms. Whitman's mental impairments likely began in

childhood, resulting in periods of depression over many years, including a suicide attempt in 2009. AR 323, 748. Ms. Bush, Dr. Taylor, and Dr. McKenna also noted extreme anxiety resulting in panic attacks, as well as generalized anxiety, causing overreaction to minor stresses, compulsive behaviors, irrational fears regarding contamination, and excessive hand-washing (20-50 times per day). AR 320, 323, 735, 751. The medical sources further noted that her anxiety causes fairly extreme social isolation and affects her ability to understand and remember instructions, concentrate on tasks, and engage appropriately with others. AR 324, 746, 750-51. Dr. McKenna opined that Ms. Whitman "cannot work in her current state," and provided a guarded prognosis that she might be able to pursue part-time vocational rehabilitation in conjunction with treatment. AR 324-25. Similarly, Ms. Bush and Dr. Taylor opined that Ms. Whitman would be unlikely to complete a regular workday without disruption from her anxiety and OCD. AR 735, 751.

Indeed, the ALJ did not indicate precisely what statements Ms. Whitman exaggerated when reporting to Ms. Bush as compared to Dr. McKenna. The ALJ, however, did indicate in a footnote that Ms. Whitman apparently made inconsistent statements to Dr. McKenna and another therapist, Sheila Flanagan, L.P.C. AR 30. Specifically, the ALJ noted that although she told Dr. McKenna that "she did her own laundry, but was allergic to some detergent," she later told Ms. Flanagan that, in the context of being too anxious to enter the laundry room, she "would like to work on the laundry room next." AR 321. Therapy records from the time period shortly after Ms. Whitman's statement to Dr. McKenna imply Ms. Whitman claimed that her anxiety essentially prevented her from entering her laundry room. As such, it was not unreasonable for the ALJ to find an inconsistency. Nonetheless, Ms. Whitman's equivocal reports regarding one

detail of her life to Dr. McKenna and Ms. Flanagan in 2012 is not a specific and legitimate reason to discredit the July 30, 2014 opinion provided by Ms. Bush and Dr. Taylor.[1]

Further, although the ALJ posits that Ms. Whitman *did not* exaggerate her symptoms to Dr. McKenna, he nevertheless accorded the same diminished weight to her opinion as he did to that of Ms. Bush and Dr. Taylor, although the opinions were substantially similar. AR 40. The ALJ supported his finding using the same rationale he invoked for discrediting Ms. Bush and Dr. Taylor, noting that Dr. McKenna had also been "taken in by the claimant's histrionic presentation[.]" *Id.* Thus, the ALJ reasoned, although Ms. Whitman did not exaggerate "her abilities" to Dr. McKenna as she purportedly did to Ms. Bush and Ms. Flanagan, Dr. McKenna nevertheless opined that Ms. Whitman was markedly impaired in a number of functional areas. *Id.* This complex analysis allowed the ALJ to find that the functional limitations recognized by Ms. Bush and Dr. Taylor were significantly more severe than, and therefore inconsistent with, those recognized by Dr. McKenna; and, simultaneously, that both Ms. Bush and Dr. McKenna had been fooled by Ms. Whitman's alleged malingering, tainting both of their opinions. AR 40.

The ALJ's conclusions are undermined by the failure to provide legally sufficient rationales for finding that Dr. McKenna's conclusions were inconsistent with Ms. Whitman's examination presentation. As discussed above, Dr. McKenna did not feel Ms. Whitman was malingering, but stated instead that "the most notable aspect of her presentation is severe anxiety," and that her "complaints are credible and consistent with her presentation on interview and available records." AR 323-24. The ALJ's conclusions are further undermined by the failure to provide legally sufficient reasons for generally discrediting Ms. Whitman's symptom

---

[1] Ms. Whitman does not contest the ALJ's accordance of little weight to Ms. Bush's January 21, 2014 opinion that "[h]er condition prevents her from being able to function in a work or work-like environment at the current time." *See* AR 38, 735.

allegations, to the extent that erroneous finding supported the ALJ's decision to accord more weight to the state agency reviewing psychologist than treating and examining medical sources Dr. McKenna, Ms. Bush, and Dr. Taylor. AR 40. Thus, the ALJ's conclusions as to the May 2012 opinion of Dr. McKenna and the July 2014 opinion of Ms. Bush and Dr. Taylor do not satisfy the "specific and legitimate reasons" standard.

## C. Lay Witness Testimony

Ms. Whitman assigns error to the ALJ's evaluation of the lay witness testimony provided by her boyfriend, Glenn R. Alfarosancho. Mr. Alfarosancho indicated Ms. Whitman has trouble sleeping, that he helps her prepare meals, that she does not like spending time in the kitchen, that he does the laundry and helps her fold the laundry, and takes care of paying the bills for the couple. AR 274. The ALJ indicated "the claimant is unable to perform many of these activities because of her impairments . . . these allegations are not consistent with the claimant's statements to her therapists . . . ." AR 41.

Lay testimony regarding a claimant's symptoms or how an impairment affects claimant's ability to work is competent evidence that an ALJ must take into account. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (citations omitted). The ALJ must provide "reasons germane to each witness" in order to reject such testimony. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) (citations omitted). Statements that are inconsistent with a claimant's own allegations provide a germane reason to discount a lay witness's testimony. *See Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The ALJ misconstrued Mr. Alfaransancho's testimony by overstating the lay witness's position. Contrary to the ALJ's assertion, Mr. Alfaransancho did not state that Ms. Whitman was wholly unable to perform the activities he discussed. Rather, he stated that he *assists* Ms.

Whitman with many household activities. As such, the ALJ's reasoning is not germane to the lay witness and cannot be affirmed.

**D.  Step Three – Listing § 12.06**

Ms. Whitman contends that the ALJ erred by finding she did not meet Listing § 12.06 (anxiety and obsessive-compulsive disorders) at step three of the sequential analysis. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06. For the reasons explained *infra*, because further proceedings are required, the Court cannot now decide the issue of whether Ms. Whitman's combination of impairments meets one of the listings. Although the Commissioner concedes the "paragraph A" criteria are met, there is conflicting medical opinion as to whether Ms. Whitman has established the requisites of "paragraph B" or, alternatively, "paragraph C." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06; AR 22-25. Whether Ms. Whitman's impairments meet or equal a listing is largely contingent on which medical source opinions are accorded the greatest weight. *Tackett*, 180 F.3d at 1100. On remand, the ALJ must reevaluate whether Ms. Whitman is presumptively disabled at step three.

**E.  RFC Formulation**

Ms. Whitman assigns error to the ALJ's RFC formulation. In response, the Commissioner, citing *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175-76 (9th Cir. 2008), contends that Ms. Whitman's argument is foreclosed by the ALJ's appropriate weighing of the relevant evidence, including Ms. Whitman's credibility, the contested opinions provided by Dr. McKenna, Ms. Bush, and Dr. Taylor, and the lay witness. Because the ALJ's rationales for weighing testimonial and medical source evidence do not meet the requisite legal standard, however, the Commissioner's argument is inapposite. Similarly, because the ALJ did not properly discredit evidence that suggested functional limitations greater than those set for the in the RFC, it is not supported by substantial evidence. Remand is required to address this error.

## F. Remand for Further Proceedings

Ms. Whitman argues that the improperly rejected evidence should be credited as true, and this case remanded for immediate payment of benefits. Within the Court's discretion under 42 U.S.C. § 405(g) is the "decision whether to remand for further proceedings or for an award of benefits." *Holohan v. Massanari*, 246 F.3d 1195, 1210 (9th Cir. 2001) (citation omitted). Although a court should generally remand to the agency for additional investigation or explanation, a court has discretion to remand for immediate payment of benefits. *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099-1100 (9th Cir. 2014). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Id.* at 1100. A court may not award benefits punitively and must conduct a "credit-as-true" analysis on evidence that has been improperly rejected by the ALJ to determine if a claimant is disabled under the Act. *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

In the Ninth Circuit, the "credit-as-true" doctrine is "settled" and binding on this Court. *Garrison*, 759 F.3d at 999. The Ninth Circuit articulates the rule as follows:

> The district court must first determine that the ALJ made a legal error, such as failing to provide legally sufficient reasons for rejecting evidence. If the court finds such an error, it must next review the record as a whole and determine whether it is fully developed, is free from conflicts and ambiguities, and all essential factual matters have been resolved. In conducting this review, the district court must consider whether there are inconsistencies between the claimant's testimony and the medical evidence in the record, or whether the government has pointed to evidence in the record that the ALJ overlooked and explained how that evidence casts into serious doubt the claimant's claim to be disabled. Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits.

If the district court does determine that the record has been fully developed and there are no outstanding issues left to be resolved, the district court must next consider whether the ALJ would be required to find the claimant disabled on remand if the improperly discredited evidence were credited as true. Said otherwise, the district court must consider the testimony or opinion that the ALJ improperly rejected, in the context of the otherwise undisputed record, and determine whether the ALJ would necessarily have to conclude that the claimant were disabled if that testimony or opinion were deemed true. If so, the district court may exercise its discretion to remand the case for an award of benefits. A district court is generally not required to exercise such discretion, however. District courts retain flexibility in determining the appropriate remedy and a reviewing court is not required to credit claimants' allegations regarding the extent of their impairments as true merely because the ALJ made a legal error in discrediting their testimony.

*Dominguez v. Colvin*, 808 F.3d 403, 407-08 (9th Cir. 2015) (internal citations and quotation marks omitted).

The Court finds that the ALJ erred in evaluating Ms. Whitman's symptom testimony, lay testimony, and medical source evaluations, which resulted in an erroneous RFC and a step five finding that was therefore not based on substantial evidence. Several issues, however, remain unresolved sufficient to preclude a remand for immediate payment of benefits. First, although the ALJ did not provide clear and convincing reasons to discredit Ms. Whitman's symptom testimony, ambiguity remains as to her ability to perform normal ADLs.

Although the ALJ provided insufficient reasons to discredit Ms. Whitman's testimony, it is possible there *are* legally sufficient reasons to do so, just as there are plausible explanations why Ms. Whitman's ability to perform ADLs may not be consistent over time due to the nature of her mental impairments, as the Ninth Circuit explained at length in *Garrison*. In any event, soliciting further testimony from Ms. Whitman or Mr. Alfarosancho may be useful in resolving some of the factual ambiguities surrounding the nature and extent of her impairments over time.

Further investigation into the information provided by the medical sources of record may also be helpful in resolving ambiguities. For example, Dr. McKenna opined that Ms. Whitman might eventually be able to sustain regular work if she adhered to her treatment. Similarly, although Ms. Bush opined that Ms. Whitman couldn't work in January 2014, she did not foreclose the possibility of work in the future, and noted Ms. Whitman had been "very successful" in using coping methods. It may be appropriate to re-contact these medical sources and determine whether their opinions are different after reviewing the entire record or if they can provide further support for the functional limitations they assessed. It may also be appropriate to solicit the opinion of another medical expert, who ideally would be able to administer comprehensive psychological testing to provide a more concrete, objective basis for accepting or rejecting the other medical source opinions of record. For these reasons, although the ALJ's decision cannot be affirmed due to legal error, serious doubt remains as to whether Ms. Whitman is, in fact, disabled under the Act. Therefore, the appropriate remedy is to reverse the Commissioner's decision and remand the case with directions to reopen the record.

## CONCLUSION

The Commissioner's decision that Ms. Whitman was not disabled prior to June 25, 2011 is not based on proper legal standards, and the findings are not supported by substantial evidence. The Commissioner's decision is REVERSED and this case is REMANDED for further proceedings.

**IT IS SO ORDERED**.

DATED this 2nd day of June, 2017.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge